**Jon P. Stride**, OSB #903887
  Direct Dial:  503.802.2034
  Direct Fax:  503.972.3734
  Email:  jon.stride@tonkon.com
**Steven D. Olson**, OSB #003410
  Direct Dial:  503.802.2159
  Direct Fax:  503.972.3859
  Email:  steven.olson@tonkon.com
**Sarah Einowski**, OSB #093412
  Direct Dial:  503.802.5738
  Direct Fax:  503.274.8779
  Email:  sarah.einowski@tonkon.com
**TONKON TORP LLP**
1600 Pioneer Tower
888 SW Fifth Avenue
Portland, OR  97204

    Attorneys for Plaintiff/Counterclaim Defendant Quantum, Inc.

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| **QUANTUM, INC.**, an Oregon corporation,<br><br>    Plaintiff,<br><br>    v.<br><br>**AKESO HEALTH SCIENCES, LLC**,<br>a California corporation,<br><br>    Defendant. | Civil No. 3:16-cv-00334-JE<br><br>**DECLARATION OF DAVID SHAW IN SUPPORT OF PLAINTIFF/COUNTERCLAIM DEFENDANT QUANTUM, INC.'S MOTION FOR SUMMARY JUDGMENT** |
| **AKESO HEALTH SCIENCES, LLC**,<br>a California corporation,<br><br>    Counter-Claimant,<br><br>    v.<br><br>**QUANTUM, INC.**, an Oregon corporation,<br><br>    Counterclaim Defendant. | |

PAGE 1 -   DECLARATION OF DAVID SHAW IN SUPPORT OF PLAINTIFF/COUNTERCLAIM
          DEFENDANT QUANTUM, INC.'S MOTION FOR SUMMARY JUDGMENT

I, DAVID SHAW, depose and say:

1. I am President of Quantum, Inc. ("Quantum"). I have personal knowledge of the facts attested to herein and if called as a witness would competently testify thereto. I make this declaration in support of Quantum's motion for summary judgment.

2. Quantum is a company based in Eugene, Oregon. Since 1981, Quantum has sold high-quality, science-based natural health products. Quantum currently sells over 60 products throughout the United States and Canada.

3. Quantum owns a number of trademarks for natural health products, including the "MIGRELIEF" mark. Quantum registered the "MIGRELIEF" mark in 1996. It is Trademark Registration No. 2,002,902.

4. Attached hereto as **Exhibit 1** is a true and correct copy of the 2002 Contract between Quantum and PR-Osteo, LLC.

5. Quantum never exercised its extension option in the 2002 Contract. Quantum did agree to two one-month extensions, while we worked on a new contract, which extended the contract to October 31, 2004. However, when those negotiations dragged on, I decided not to agree to any further extensions. I told Akeso that I was not interested in any further extensions of the 2002 Contract. I have always understood that the 2002 Contract expired on October 31, 2004.

6. Quantum and Akeso spent a long time trying to negotiate a new contract, both before and after the 2002 Contract expired. We proposed various terms back and forth for well over a year. We were never able to reach agreement. I tried again on a few occasions later to get a contract with Akeso, including in 2007 and 2014, but it never happened.

7. Attached hereto as **Exhibit 2** is a true and correct copy of an email from David Weinberg to me, dated May 4, 2004.

8. Attached hereto as **Exhibit 3** is a true and correct copy of an email exchange between me and David Weinberg, dated May 4, 2004.

9. Attached hereto as **Exhibit 4** is a true and correct copy of an email from David Weinberg to me, dated July 28, 2004.

10. Attached hereto as **Exhibit 5** is a true and correct copy of an email from David Weinberg to me, dated August 3, 2004.

11. Attached hereto as **Exhibit 6** is a true and correct copy of an email from David Weinberg to me, dated September 3, 2004.

12. Attached hereto as **Exhibit 7** is a true and correct copy of an email exchange between me and David Weinberg, dated September 29, 2004.

13. Attached hereto as **Exhibit 8** is a true and correct copy of an email exchange between me and David Weinberg, dated November 29-30, 2004.

14. Attached hereto as **Exhibit 9** is a true and correct copy of an email exchange from David Weinberg to me, dated January 4, 2005, at 3:32 p.m.

15. Attached hereto as **Exhibit 10** is a true and correct copy of an email exchange between me and David Weinberg, dated January 4, 2005, at 3:52 p.m. Akeso never did send the drafts referenced in this email.

16. Attached hereto as **Exhibit 11** is a true and correct copy of an email exchange between me and David Weinberg, dated March 4, 2005.

17. Attached hereto as **Exhibit 12** is a true and correct copy of a letter from Edward S. Gelfand to me, dated April 29, 2005.  I do not recall receiving this letter or how I responded.

18. Attached hereto as **Exhibit 13** is a true and correct copy of an email from David Weinberg to me, dated June 28, 2005.

19. Attached hereto as **Exhibit 14** is a true and correct copy of an email from me to David Weinberg, dated August 8, 2005.

20. Attached hereto as **Exhibit 15** is a true and correct copy of a memo signed by both Quantum and Akeso on September 27, 2005.  Quantum and Akeso had been trying to negotiate a new contract for a year and a half at this point, and this memo was intended to memorialize where we had gotten in our negotiations.  It was also intended to put the past behind us and move forward, which is why we included a release in paragraph 3.  The release was intended to take effect immediately.  The other terms were prospective—they would only take effect if and when the parties achieved and signed a final agreement.

21. Attached hereto as **Exhibit 16** is a true and correct copy of an email exchange between me and Curt Hendrix, dated November 7 and 17, 2005.

22. Attached hereto as **Exhibit 17** is a true and correct copy of a draft "distribution agreement," from approximately November 2005.

23. Attached hereto as **Exhibit 18** is a true and correct copy of an email from me to Curt Hendrix, dated February 6, 2006.  Earlier that day, when I spoke to Mr. Hendrix on the phone, he acknowledged that the 2002 Contract was no longer in effect but made excuses not to put that in writing, which he had also done before.  There was no question in my mind that the

2002 Contract was expired, and Mr. Hendrix acknowledged that to me on multiple occasions on the phone, so I felt he was playing games by refusing to put it in writing.

24. Attached hereto as **Exhibit 19** is a true and correct copy of an email exchange between me and Curt Hendrix, dated March 7, 2006.

25. Attached hereto as **Exhibit 20** is a true and correct copy of an email from me to Eve McClure, dated March 8, 2006. This email accurately summarizes the telephone conversation that I had with Curt Hendrix. I did not receive the promised letter.

26. Attached hereto as **Exhibit 21** is a true and correct copy of an email exchange between me and Curt Hendrix, dated August 26, 2006.

27. Attached hereto as **Exhibit 22** is a true and correct copy of an email from me to David Weinberg, dated September 14, 2006.

28. Attached hereto as **Exhibit 23** is a true and correct copy of an email from Curt Hendrix to me, dated March 2, 2007. Mr. Hendrix's acknowledgement that the 2002 Contract was no longer in effect made me more comfortable about continuing to do business with Akeso. As for the terms that Mr. Hendrix proposed for a new contract, they were unacceptable to Quantum, and, like every other proposal over the prior three years, nothing ever came of this proposal for a new contract.

29. From October 31, 2004, when the 2002 Contract expired, until February 2016, when the parties stopped doing business together, I always understood that Quantum and Akeso were doing business without a contract. I usually described our relationship after the contract expired as an "arrangement" or "accommodation" or "gentleman's agreement." Neither of us was required to do anything, and either of us could stop doing business with the other at any time. Quantum still wanted to purchase migraine tablets from Akeso, however, and Akeso

still wanted to use Quantum's MIGRELIEF mark, so it made sense to try to get along to further our mutual interests. Over the years, I mentioned the lack of a contract on numerous occasions in conversations with Curt Hendrix.

30. As far as how we conducted business, Quantum and Akeso's relationship became looser after the 2002 Contract expired. Akeso changed its price several times. Quantum changed the percentage it put down on orders. There was no more talk of minimum purchase requirements or transferring the trademark, except in failed contract negotiations. We worked out which markets and stores we would each sell in, making adjustments and accommodating each other as best we could along the way in order to serve our mutual interests in marketing the product. There was no point in Quantum and Akeso competing against each other for the same customers. I also liked Curt Hendrix and considered him a friend, so I tried to accommodate him. It was easier to get along with him if I was accommodating too, because he had a tendency to yell and be aggressive about things. I never at any time after October 31, 2004, however, believed that either Quantum or Akeso was bound by the expired 2002 Contract. I understood that we were doing business together on an at-will basis.

31. From October 31, 2004, until March 3, 2016, Quantum permitted Akeso, at Quantum's discretion, to use Quantum's MIGRELIEF trademark, for so long as Akeso continued to sell its patented formula migraine tablets to Quantum. After October 31, 2004, Quantum never granted Akeso any other rights with respect to its MIGRELIEF trademark.

32. After October 31, 2004, I never made any representation to Curt Hendrix, David Weinberg, or anyone else at Akeso that Quantum would sell its MIGRELIEF trademark to Akeso for $25,000. The only representation I made before October 31, 2004, is in the 2002 Contract.

PAGE 6 -   DECLARATION OF DAVID SHAW IN SUPPORT OF PLAINTIFF/COUNTERCLAIM DEFENDANT QUANTUM, INC.'S MOTION FOR SUMMARY JUDGMENT

33. I never made any representation to Curt Hendrix, David Weinberg, or anyone else at Akeso that, without a contract, Quantum would transfer its MIGRELIEF trademark to Akeso at no cost. When we were trying to negotiate a new contract, transfer of the trademark with a perpetual license back to Quantum was a proposed term on the table, but those negotiations were unsuccessful and we never entered into any contract. The only time I ever discussed the possibility of trademark transfer with Akeso was in the context of contract negotiations.

34. From 2004 until 2016, Quantum continued to buy Akeso's patented migraine pills on an at-will basis.

35. In 2014, I accidentally sent to Curt Hendrix a copy of an internal memorandum in which Quantum was contemplating how to stop doing business with Akeso without disrupting Quantum's sales or having a negative effect on Quantum's MIGRELIEF brand. Mr. Hendrix was upset, so I flew down to meet with him, and I thought we smoothed things out enough that we would be able to keep doing business with each other. That was the beginning of the end of the relationship though.

36. Attached hereto as **Exhibit 24** is a true and correct copy of a letter from Curt Hendrix to me, dated November 30, 2015. Quantum was not interested in the proposed terms.

37. In February 2016, Akeso gave notice that it would no longer sell migraine tablets to Quantum.

38. On March 3, 2016, Quantum revoked permission for Akeso to use its MIGRELIEF trademark, which was always conditioned on Akeso's sale of migraine tablets to

Quantum.  Akeso has continued to use the mark, however, despite Quantum's demand to cease and desist.

39. After Quantum stopped purchasing migraine tablets from Akeso, Quantum reformulated the product and began selling a new formulation of migraine tablets under its MIGRELIEF trademark.  Quantum's new formulation contains Co-Q10, magnesium, and riboflavin, whereas, upon information and belief, Akeso's formulation includes feverfew (aka PURACOL), magnesium, and riboflavin.  Upon reformulation, Quantum immediately created a new label for its product, which contains no reference to feverfew, PURACOL, or Akeso.  Attached hereto as **Exhibit 25** is a true and correct copy of images of Quantum's current label.  Quantum also updated its website and marketing materials to reflect the new formulation.

40. Quantum has notified its customers of the product reformulation, including that it no longer contains feverfew (aka PURACOL).  Quantum also has asked its customers to update their websites and marketing materials to reflect the reformulation.

**Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true and correct.**

DATED this 31st day of March, 2017.

> */s/ David Shaw*
> David Shaw

# CERTIFICATE OF SERVICE

I hereby certify that I served the foregoing **DECLARATION OF DAVID SHAW IN SUPPORT OF PLAINTIFF/COUNTERCLAIM DEFENDANT QUANTUM, INC.'S MOTION FOR SUMMARY JUDGMENT** on:

> Aaron Brian, OSB #981849
>   Email:  abrian@nixonpeabody.com
> Staci Jennifer Riordan, admitted *pro hac vice*
>   Email:  sriordan@nixonpeabody.com
> Nixon Peabody LLP
> 300 South Grand Avenue, Suite 4100
> Los Angeles, CA  90071
>     Attorneys for Defendant and Counterclaimant

☑  by electronic means through the Court's Case Management/Electronic Case File system on the date set forth below;

☐  by causing a copy thereof to be emailed to said attorneys at their last-known email address on the date set forth below; and/or

☐  by mailing a copy thereof in a sealed, first-class postage prepaid envelope, addressed to said attorneys' last-known address and depositing in the U.S. mail at Portland, Oregon on the date set forth below.

DATED this 31st day of March, 2017.

> TONKON TORP LLP
>
> By:  *s/ Jon P. Stride*
>   Jon P. Stride, OSB #903887
>   Steven D. Olson, OSB #003410
>   Sarah Einowski, OSB #093412
>
>   Attorneys for Plaintiff/Counterclaim Defendant Quantum, Inc.