IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

| | | |
|---|---|---|
| QUANTUM, INC., an Oregon corporation | ) | Civil No.: 3:16-cv-00334-JE |
| | ) | |
| Plaintiff, Counterclaim Defendant, | ) | OPINION AND ORDER |
| | ) | |
| v. | ) | |
| | ) | |
| AKESO HEALTH SCIENCES, LLC, a | ) | |
| California corporation, | ) | |
| | ) | |
| Defendant, Counter-Claimant. | ) | |
| _____ | ) | |

Jon P. Stride, Steven Olson, Robin Aoyagi, Sarah Einowski
Tonkon Torp LLP
1600 Pioneer Tower
888 SW Fifth Avenue, Suite 1600
Portland, OR 97204-2099

        Attorneys for Plaintiff/Counterclaim Defendant


Aaron M. Brian, Staci Jennifer Riordan
Nixon Peabody LLP
300 South Grand Avenue, Suite 4100
Los Angeles, CA 90071-3151

        Attorneys for Defendant/Counter-Claimant

JELDERKS, Magistrate Judge:

Plaintiff /Counter-Defendant Quantum brings this action for declaratory judgment and trademark infringement. Defendant/ Counter-Claimant Akeso brings nineteen counterclaims. Since the filing of this case, the parties have provided extensive briefing and oral argument on a number of underlying issues.  The case is currently set for trial on June 7, 2017.

This matter comes before the Court on Quantum's motion for summary judgment. On May 16, 2017, the Court heard oral argument on the motion. On May 18, 2017, in a telephone conference with counsel, the Court issued oral rulings on the motion and informed the parties that it would issue a brief written order to aid the parties' preparation for trial.  In light of the factual disputes in this case, the proximity of the trial date, and the assumption that the parties are familiar with the facts, the Court will not recite the extensive background of the case but will only provide a brief summary below and discuss the material facts in context as they apply to the claims at issue in the motion for summary judgment.

For the reasons discussed below, Quantum's motion is granted in part and denied in part. Akeso's motion for summary judgment pursuant to Fed. R. Civ. Pro. 56(f) is denied.


## Claims and Counter Claims

Quantum brings two claims, with its Second Claim comprising three Counts.  Akeso brings nineteen counterclaims.

## I. Quantum's Claims

**Claim One** seeks a declaration under the Declaratory Judgment Act that the 2002 Contract between the parties expired on October 31, 2004.

**Claim Two**:

> **Count One**: Trademark Infringement of the MIGRELIEF trademark under 15 U.S.C. §1114.

> **Count Two:** Unfair Competition in violation of 15 U.S.C. §1125(a). Quantum alleges Akeso's use of the MIGRELIEF trademark after its right to do so terminated has caused and will continue to cause customer confusion.

> **Count Three:** Common law trademark infringement and unfair competition through Akeso's wrongful use of the MIGRELIEF trademark.

## II. Akeso's Counterclaims

**Count 1**: Declaratory Relief under the Declaratory Judgment Act that the 2002 Contract is valid and enforceable.

**Count 2:** Breach of Contract/Specific Performance. Akeso seeks an Order that Quantum sell to Akeso the MIGRELIEF trademark and any common law trademark rights to MIGRELIEF for the price of $25,000.

**Count 3**: Breach of contract through sales to improper accounts.

**Count 4**: Breach of implied covenant of good faith and fair dealing through failure to honor the 2002 Contract and the trademark purchase provisions therein.

**Count 5**: Promissory Estoppel. Akeso alleges Quantum failed to fulfill promises with respect to Akeso's right to purchase the MIGRELIEF trademark for $25,000 or a later agreement to transfer the trademark to Akeso at no cost. Akeso seeks an Order that Quantum specifically perform in conformity with the terms of the 2002 Contract or in an alternative manner deemed equitable by the Court.  Akeso alternatively asks the Court to grant it the right to continue using

the MIGRELIEF trademark and/or transfer to Akeso the MIGRELIEF trademark, the trademark application, any common law trademark rights and the goodwill attached.

**Count 6**: Equitable Estoppel. Akeso asks the Court to order that Quantum specifically perform in conformity with the terms of the 2002 Contract or in an alternative manner deemed equitable by the Court with respect to Akeso's right to purchase or receive the MIGRELIEF trademark. Akeso alternatively asks the Court to grant it the right to continue using the MIGRELIEF trademark and/or transfer to Akeso the MIGRELIEF trademark, the trademark application, any common law trademark rights and the goodwill attached.

**Count 7**: Cancellation of MIGRELIEF trademark. Akeso alleges that Quantum has not engaged in substantially exclusive use or controlled the quality of the use of the MIGRELIEF trademark and has not had the use in commerce required to support the trademark registration. Akeso asks the Court to cancel and invalidate the MIGRELIEF trademark or, alternatively, to grant Akeso the right to continue using the trademark due to its invalidity.

**Count 8**: Cancellation of MIGRELIEF trademark application.  Akeso alleges Quantum has filed a second application for the MIGRELIEF trademark. It seeks a declaration that Quantum's continuing efforts to register the MIGRELIEF trademark are an infringement of Akeso's rights and seeks an Order enjoining Quantum from filing further documents with the USPTO to complete or sustain registration of the MIGRELIEF trademark.

**Count 9**: Breach of Implied Contract/Specific Performance. Akeso seeks an Order compelling Quantum to sell or transfer to Akeso the MIGRELIEF trademark, any common law trademark rights and the goodwill attached.

**Count 10:** Breach of Implied Contract through sales to improper accounts. Akeso alleges Quantum breached the parties' implied contract by selling MIGRELIEF tablets outside the agreed upon sales channels.

**Count 11**: Federal Trademark Infringement of the MIGRELIEF trademark. Akeso alleges that it is the rightful owner of the MIGRELIEF trademark. It further alleges that Quantum is selling under the MIGRELIEF trademark and with the same or similar packaging, marketing and sales materials, a tablet containing an alternate formula to the Patented Formula.

**Count 12:** Akeso alleges Quantum engaged in unfair competition in violation of 15 U.S.C. §1125(a) through use of the MIGRELIEF trademark on tablets containing the Alternate Formula.

**Count 13**: Akeso asserts common law trademark infringement and unfair competition claims regarding use of the MIGRELIEF trademark on Alternate Formula tablets.

**Count 14**: Akeso alleges Quantum violated state unfair and deceptive trade practices laws through its alleged use of the MIGRELIEF trademark.

**Count 15**: Federal Trademark Infringement of the PURACOL trademark. Akeso alleges Quantum is using Akeso's PURACOL trademark to sell migraine relief tablets similar to what Akeso sells using the same mark.

**Count 16:** Akeso alleges Quantum engaged in unfair competition in violation of 15 U.S.C. §1125(a) with respect to the use of Akeso's PURACOL trademark.

**Count 17:** Akeso asserts common law trademark infringement and unfair competition claims regarding Quantum's alleged use of the PURACOL trademark.

**Count 18**: Akeso alleges Quantum violated state unfair and deceptive trade practices laws through its alleged use of the PURACOL trademark.

**Count 19**: Akeso seeks injunctive relief .

OPINION AND ORDER – 5

## Evaluating Motions for Summary Judgment

Federal Rule of Civil Procedure 56 authorizes summary judgment if no genuine issue exists regarding any material fact and the moving party is entitled to judgment as a matter of law. The moving party must show the absence of an issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 325 (1986). The moving party may discharge this burden by showing that there is an absence of evidence to support the nonmoving party's case. *Id.* When the moving party shows the absence of an issue of material fact, the nonmoving party must go beyond the pleadings and show that there is a genuine issue for trial. *Id.* at 324.

The substantive law governing a claim or defense determines whether a fact is material. *T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n.*, 809 F.2d 626, 630 (9th Cir. 1987). Reasonable doubts concerning the existence of a factual issue should be resolved against the moving party. *Id.* at 630-31. The evidence of the nonmoving party is to be believed, and all justifiable inferences are to be drawn in the nonmoving party's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1985). No genuine issue for trial exists, however, where the record as a whole could not lead the trier of fact to find for the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

## Discussion

Quantum is an Oregon corporation based in Eugene, Oregon that is in the business of selling natural health products. Shaw Decl. ¶2. Its president is David Shaw. Id. at ¶1. In 1996 Quantum registered the trademark "MIGRELIEF." Id. at ¶3.

Akeso is a California corporation that sells nutritional supplements and other natural health products. Curt Hendrix is Akeso's CEO. Akeso, by and through its predecessor PR-Osteo, was granted a patent for a formulation of natural ingredients used to treat migraine pain. Hendrix

Decl. ¶ 3. The "Patented Formula" includes PURACOL, a proprietary source of the herb feverfew; magnesium and riboflavin. Hendrix Decl. ¶4. In addition to the Patented Formula, Akeso is owner of the trademarked term "PURACOL." Id. at ¶35.

The parties entered an agreement dated February 11, 2002 and signed on March 7, 2002 ("the 2002 Contract"). Shaw Decl. Ex. 1. The terms of the 2002 Contract are set out below but, in general, the agreement concerned Quantum's purchase of "Patented Formula" tablets from Akeso, Quantum's sales and marketing rights to that product, and Quantum's grant to Akeso of a license to use the MIGRELIEF trademark.

From the effective date of the 2002 Contract through November 30, 2015, Quantum and Akeso continued to do business together. From late 2004 until the end of their business relationship the parties engaged in numerous, yet ultimately unsuccessful, attempts to negotiate a new contract. On September 27, 2005, the parties signed a memo purportedly memorializing their negotiations thus far ("the Agreement Memo"). Shaw Decl. Ex. 15. However, both parties agree that the Agreement Memo did not constitute a final agreement.

In a letter dated November 30, 2015, Akeso gave Quantum notice that it was terminating the 2002 Contract effective immediately and "was exercising its right to purchase the MIGRELIEF trademark." Shaw Decl. Ex. 24. In a letter dated February 2016, Akeso gave notice that it would no longer sell migraine tablets to Quantum. Shaw Decl. ¶37. Quantum then revoked permission for Akeso to use the MIGRELIEF trademark. Shaw Decl. ¶38; Stride Decl. Ex. 1. After Quantum stopped purchasing migraine tablets from Akeso, it reformulated the product and began selling this "Alternate Formula" under the MIGRELIEF trademark. Shaw Decl. ¶39. The Alternate Formula contains Co-Q10, magnesium and riboflavin but does not contain feverfew. Shaw Decl. ¶¶ 39-40.

OPINION AND ORDER – 7

Quantum has organized its motion for summary judgment into nine sub-motions. I will address each sub-motion in turn.

## I. Motion 1 – The 2002 Contract

Quantum's First Claim seeks a declaration that the 2002 Contract between the parties expired on October 31, 2004. Akeso's First Counterclaim seeks a declaration that the 2002 Contract did not expire and that it remained in effect until it was terminated by Akeso on November 30, 2015.

Under Oregon law, courts follow a three-step analysis to interpret a contractual provision. *Yogman v. Parrot*, 325 Or. 358, 361, 937 P.2d 1019 (1997). The court first determines the meaning of the provision or provisions in question, within the context of the contract as a whole. In doing so, the court determines, as a matter of law, whether the provision at issue is ambiguous. *Id.* A contract provision is ambiguous if it is capable of more than one plausible and sensible interpretation. *Riverside Homes Inc. v. Murray*, 230 Or. App. 292, 304 (2009). If the provision is unambiguous, the analysis ends and the court construes the terms of the contract as a matter of law. *Yogman*, 325 Or. at 361.

In general, Oregon courts have held that summary judgment is inappropriate when the Court has determined at step one of the *Yogman* analysis that the provision(s) are ambiguous. *See, e.g.*, *Dial Temp. Help Serv., Inc. v. DLF Int'l Seeds, Inc.*, 255 Or.App. 609, 611, 298 P.3d 1234 (2013) (the "general rule" is that the meaning of a contract may be disposed of by way of summary judgment only if its terms are unambiguous); *Ross Dress for Less, Inc. v. Makarios-Oregon, LLC,* 210 F. Supp. 3d 1259, 1263 (D. Or. 2016)(same). However, Oregon courts have recognized exceptions to this rule where the parties agree that there is no relevant extrinsic evidence to resolve the ambiguity or where the party that bears the burden of presenting evidence

to establish a genuine issue of material fact has failed to do so. *Yogman*, 325 Or. at 364, 937 P.2d

1019; *Dial*, 255 Or.App. at 612, 298 P.3d 1234.

The terms of the 2002 Contract are:

[1] Quantum will purchase Migra-lieve in bulk. Orders will be placed at least six weeks lead-time.

[2] Quantum's cost is $3.05 per 60 tablets. Any rise in prices to [Quantum] can be instituted with a 90 day advance written notice. Price changes to Quantum will be based upon [Akeso] maintaining the same margin as in this opening order.

[3] Quantum will order a minimum of 60,000 tablets at a time.

[4] Initial terms: 50% with order; 50% upon receipt of order.

[5] Quantum will be responsible for bottling and labeling.

[6] [Akeso] will provide Quantum with copies of both its and its contract manufacturer's product liability insurance. Quantum acknowledges that the current liability insurance covering Migra-Lieve is about to expire and there may be a period of time that there is a lapse in coverage. [Akeso] will do its best to keep such time to a minimum.

[7] For the thirty months, starting on March 1, 2002, Quantum will have all sales and marketing rights for the patented product currently known as Migra-Lieve, and any future formula modifications, for the Health Food and Natural Product Store Class of Trade including GNC stores, and, non-exclusive rights to sell the product over the internet. After the initial thirty months have passed, Quantum may, at its option, extend this agreement for additional two year periods, as long as it thereafter purchases 450,000 tablets per quarter (7,500 bottles at 60 pills per bottle). [Akeso] may cancel this agreement with 60 days notice if Quantum does not meet its minimum sales commitment. Quantum will have the right to sell out remaining inventory. Quantum will have 60 days to remedy a cancellation.

[8] Trademark License: In exchange for the sales and marketing rights stated here, Quantum licenses the use of its migraine product trademark under the conditions stated above (Migrelief, Registration #2,002,902) to [Akeso] for use in any class of trade other than health food or natural product stores. [Akeso] may sub-license the mark. If [Akeso] chooses to cancel this agreement it may continue to use the trademark by purchasing all rights to the trademark from Quantum for $25,000 within ninety days of cancellation.

[9] [Akeso] will provide Quantum with reproduction rights to all current and future sales literature, books, studies, etc. about the product (to which [Akeso]

hold[s] rights) and its ingredients and allow [Quantum] to reference them as needed to promote the product. Quantum will also have access to [Akeso] and others who have reviewed or studied the product, for promotional purposes, with fees to be negotiated for such promotional work.

[10] Finally, both parties agree to hold the other harmless for any sort of legal problems that their individual activities relating to the trademark may engender, and should there be a dispute, the prevailing party will receive legal fees.

Shaw Decl. Ex. 1 (bullets replaced with numbers for ease of reference).

Quantum asserts that the plain terms of the 2002 Contract provided for a 30-month duration unless extended for two-year periods by Quantum. Quantum also asserts that Akeso could only cancel the agreement if Quantum failed to meet its minimum purchase commitment during a two-year extension period. There is no dispute that Quantum did not exercise its option for a two-year extension period. There is also no dispute that the provisions of the original 30-month term were twice voluntarily extended until October 31, 2004 by mutual agreement of the parties. Quantum has produced evidence that it expressly rejected Akeso's offer of a third extension. Shaw Decl. Ex. 10.

Akeso argues that there is no provision that limits the entire 2002 Contract to any stated period of time.  It argues that Quantum bargained for exclusive rights to market and sell Akeso's Patented Formula in certain channels of trade and that Akeso granted these rights to Quantum for 30 months. Akeso refers to this as the "Guaranteed Supply Period."  Akeso argues that even if, at the end of the 30 months, Quantum did not want another Guaranteed Supply Period, neither Quantum's right to be the exclusive distributor in specific channels nor the contract terminated. According to Akeso, without the extension, Quantum only lost its ability to count on a supply of the Patented Formula for a fixed period of time.  Akeso further argues that its right to the MIGRELIEF trademark was a "separate, non-dependent right bargained for by Akeso and thus belonging solely to Akeso." Response at 14.  Thus, Quantum's choice to not exercise its option

for two-year extensions had no impact on Akeso's standing as the beneficial owner of the mark or on its ability to cancel the 2002 Contract and perfect legal ownership of the mark. However, Akeso also argues that "Quantum's sales and marketing rights are reciprocal to Akeso's right to buy the trademark." Response at 14.

In reply to Akeso's assertion that only Quantum's exclusivity expired in 2004, Quantum argues that the 2002 Contract specifically states that the trademark license is given in "exchange for the sales and marketing rights stated here" and that the terms "this agreement" in bullet points 7 and 8 refer to extension and cancellation of the entire agreement. Thus, Akeso's limited right to purchase the MIGRELIEF mark in the 2002 Contract was never triggered and the contract expired in its entirety in October 2004.

Upon examination of the plain language of the provisions at issue within the context of the 2002 Contract as a whole, I conclude that the language of the relevant terms of the contract is subject to only one plausible and sensible interpretation and is, therefore, unambiguous. Consequently, it is not necessary consider the extrinsic evidence submitted by either party to resolve the meaning of contract. I further conclude that the plain language of the contract supports only the conclusion that the 2002 Contract expired, in its entirety, on October 31, 2004.

Akeso's evidence that Quantum continued to place orders for and sell Akeso's tablets or that it represented to distributors that it could sell only through certain channels does not create a genuine issue of material fact that the Contract was extended or revived. This is so especially in light of Quantum's evidence that it expressly declined Akeso's offer to extend the contract past October 31, 2004 (Shaw Decl. Ex. 10); that it entered into an Agreement with Akeso that included provisions regarding the release of both parties from any prior agreements or obligations (Shaw Decl. Ex. 15); and that in communications with Akeso it repeatedly reminded

Akeso and requested acknowledgement of the 2002 Contract's expiration (Shaw Decl. Exs. 11, 18, 19, 20, 22, 23). Accordingly, Quantum's motion for summary judgment on its First Claim and on Akeso's First Counterclaim is granted.

## II. **Motion 2 – the 2005 Agreement Memo**

In sub-motion 2, Quantum seeks summary judgment on its Fourth Affirmative Defense and Akeso's contract counterclaims. Quantum asserts that the parties expressly released each other from all prior agreements and obligations on September 27, 2005 when they signed a letter of intent (the "2005 Agreement Memo"). Shaw Decl. Ex. 15.

In light of my conclusion above that the 2002 Contract expired on October 31, 2004, I need not necessarily address Quantum's motion as to the release provision in the 2005 Agreement Memo.  In any event, a plain reading of the 2005 Agreement Memo supports only the conclusion that the provision that "This memo releases both parties from prior agreements and any and all obligations" is a mutual release such that both parties gave and received consideration and that the release became effective and enforceable upon the date the Letter was signed by both parties. See Shaw Decl. Ex. 15, Para. 3. Accordingly, this motion is granted.

## III. **Motion 3**

Quantum's third sub-motion seeks summary judgment on Akeso's First (Declaratory Relief regarding the expiration of 2002 Contract), Second (Breach of Contract/Specific Performance requiring Quantum to sell to Akeso the MIGRELIEF mark) and Fourth (Breach of Implied Covenant of Good Faith and Fair Dealing through failure to honor the 2002 Contract and trademark provisions therein) Counterclaims.  These counterclaims necessarily rely on non-expiration of the 2002 Contract. *See* Akeso's First Amended and Supplemental Counterclaim, Paras. 37, 39, 54.  Therefore, because I have concluded that the 2002 Contract did expire,

OPINION AND ORDER – 12

Quantum's motion for summary judgment as to Akeso's First, Second and Fourth Counterclaims is granted.

## IV. <u>Motion 4</u>

Quantum's fourth sub-motion seeks summary judgment on Akeso's counterclaims of promissory estoppel, equitable estoppel and breach of implied contract.

### A. Implied Contract

Quantum requests summary judgment on Akeso's Ninth Counterclaim for breach of implied contract. Akeso asserts that if the 2002 Contract expired, it was replaced by an implied-in-fact agreement that contained substantially the same terms as the written contract.

An implied-in-fact contract has the same legal effect as an express contract. *Staley v. Taylor*, 165 Or. App. 256, 262, 994 P.2d 1220, 1224 (2000) (citing *Restatement (Second) of Contracts § 4 comment a (1979))*. Like an express contract, an implied contract "is based on mutual expressions of assent. That assent and the terms of the parties' agreement may be inferred from the parties' conduct." *Jaqua v. Nike, Inc.*, 125 Or. App. 294, 297 (1993); *see also Staley v. Taylor*, 165 Or. App. 256, 262 n.6 (2000) ("Frequently, implied-in-fact contracts arise because an accepted course of conduct would permit a reasonable juror to find that the parties understood that their acts were sufficient to manifest an agreement."). A party may manifest its assent to an implied in fact contract over time through its course of conduct. *Montez v. Roloff Farms, Inc.,* 175 Or.App. 532, 536–37, 28 P.3d 1255 (2001). An implied-in-fact agreement arises "only where the natural and just interpretation of the acts of the parties warrants such conclusion." *Owen v. Bradley,* 231 Or. 94, 103, 371 P.2d 966 (1962).

A party claiming breach of contract has the burden of establishing the contract's existence. *Tinn v. EMM Labs, Inc.*, No. 07-963-AC, 2009 WL 507096, at *6 (D. Or. Feb. 27,

2009) (citing *Holdner v. Holdner*, 176 Or. App. 111, 120, 29 P.3d 1199, 1203 (2001)). When the

facts are not in dispute, the determination of whether a contract exists is a question of law. *Id.*

(citing *Key West Retaining Sys., Inc. v. Holm II, Inc.*, 185 Or. App. 182, 188, 59 P.3d 1280, 1283

(2002)); *see also DCIPA, LLC v. Lucile Slater Packard Children's Hosp. at Stanford,* 868

F.Supp.2d 1042, 1053 (D.Or.2011) ("Oregon contract formation is a question of law") (citing

*Ken Hood Constr. v. Pacific Coast Constr.,* 201 Or.App. 568, 577, 120 P.3d 6 (2005), *adh'd to*

*as modified on recons.*, 203 Or.App. 768, 126 P.3d 1254 (2006)).

      As evidence in support of its argument that it did not intend to enter into a new implied

contract under the same terms as the 2002 Contract, Quantum has submitted an email from Shaw

to Akeso declining to extend the 2002 Contract beyond October 31, 2004 (Shaw Decl. Ex. 10);

multiple emails reiterating and seeking acknowledgement from Akeso that after October 31,

2004, the parties were operating without a contract (Shaw Decl. Exs. 11, 18, 19, 20, 22, 23);

multiple emails between the parties that document ongoing negotiations for distribution and

trademark assignment agreements that included terms different from those of the 2002 Contract

(Shaw Decl. Exs. 4, 5, 8, 13, 14, 23); and the 2005 Agreement Memo that contemplated

Quantum's transfer of the MIGRELIEF trademark to Akeso at no cost with Akeso licensing the

trademark back to Quantum in perpetuity (Shaw Decl. Ex 15). Quantum also points to an

absence of evidence in the record of any discussion or conduct after October 31, 2004,

manifesting an agreement regarding sale of the MIGRELIEF trademark to Akeso for $25,000.

      In response, Akeso submits evidence which it argues supports only the conclusion that

Quantum's conduct and communications manifested its understanding that the parties had an

enforceable agreement. The record contains emails from Quantum to its distributors advising

them of the terms of the parties' distribution agreement (Brian Decl. Exs. 1, 3, 4,); internal

Quantum communications acknowledging an agreement with Akeso regarding restrictions to distribution channels (Brian Decl. Exs. 5, 8, 16); and emails between the parties in which Quantum notes the parties' mutual obligations and references a contract between the parties (Brian Dec. Exs. 2, 7). Akeso asserts that the nature of the parties' business dealings between 2004 and 2015 manifested a mutual agreement that Akeso's right to purchase the mark carried forward from the 2002 Contract.

Based on the evidence in the record, it is clear there are material issues of fact regarding whether Quantum's and Akeso's conduct was sufficient to create an implied-in-fact contract. Accordingly, Quantum's motion for summary judgment against Akeso's Ninth Counterclaim is denied.

## B.  Promissory Estoppel

Akeso's Fifth Counterclaim is for promissory estoppel based on Quantum's alleged promise to transfer the MIGRELIEF trademark to Akeso.

In Oregon "promissory estoppel is not a 'cause of action' in itself, but is a subset of and a theory of recovery in breach of contract actions." *Neiss v. Ehlers*, 135 Or. App. 218, 227–28, 899 P.2d 700 (1995) (citations omitted). The elements of a claim for promissory estoppel are: "(1) a promise (2) which the promisor, as a reasonable person, could foresee would induce conduct of the kind which occurred, (3) actual reliance on the promise, (4) resulting in a substantial change in position." *Id.* at 223 (quoting *Bixler v. First National Bank*, 49 Or. App. 195, 199–200 (1980)). Promissory estoppel does not apply when a valid contract exists. *See, e.g., Hill v. Mayers,* 104 Or.App. 629, 631, 802 P.2d 694 (1990).

As discussed above, I have concluded that there exist genuine issues of material fact regarding whether there was an implied contract between Quantum and Akeso that governed

transfer of the MIGRELIEF trademark. Since the existence of a valid contract is a threshold

matter in the determination of whether promissory estoppel should be applied in this case,

Quantum's motion for summary judgment as to Akeso's Fifth Counterclaim is denied.

**C. Equitable Estoppel**

Akeso's Sixth Counterclaim is for equitable estoppel based on Quantum's alleged

representation that it would transfer the MIGRELIEF trademark to Akeso.

Quantum correctly asserts that equitable estoppel is an affirmative defense, not a cause of

action. Akeso concedes that this counterclaim should have been pled as an affirmative defense.

Accordingly, this counterclaim is dismissed.

**V.  Motion 5**

Sub-motion five addresses Akeso's Eleventh, Twelfth, Thirteenth and Fourteenth

counterclaims. These counterclaims allege trademark infringement, unfair competition and unfair

and deceptive trade practices claims under state, federal and common law against Quantum

based on Quantum's use of the MIGRELIEF mark.

Quantum asserts that it is and has been the sole owner of the MIGRELIEF trademark. It

argues that a trademark must be owned by and associated with the source of the goods and not

the goods themselves. Quantum further asserts that there was no "joint ownership" of the mark,

and the fact that Quantum sold tablets under the MIGRELIEF mark that were supplied by Akeso

does not convey any ownership rights to Akeso since a "distributor may own the trademark in

goods it does not manufacture." Reply at 19, citing *Premier Dental Prod. Co. v. Darby Dental

Supply Co.*, 794 F2d 850, 853 (3d Cir.), *cert. den.,* 479 U.S. 950 (1986).

Akeso argues that because both companies were selling goods bearing the MIGRELIEF

trademark, the primary meaning of the trademark to the consuming public is Akeso's Patented

Formula. Therefore, according to Akeso, Quantum has abandoned its right to claim to be the "source" identified by the mark.

A trademark is a word, phrase, symbol or design that designates a single source of the goods. 15 U.S.C. §1127 ("Trademark").

Under 15 U.S.C. §1127, a mark shall be deemed to be "abandoned"

> (2) When any course of conduct of the owner, including acts of omission as well as commission, causes the mark to become the generic name for the goods or services on or in connection with which it is used or otherwise to lose its significance as a mark. Purchaser motivation shall not be a test for determining abandonment under this paragraph."

15 U.S.C.A. § 1127 ("Abandoned").

In *Defiance Button Mach. Co. v. C & C Metal Prod. Corp.*, 759 F.2d 1053 (2d Cir. 1985) the court explained abandonment as follows:

> The mark also ceases to be enforceable against others when it loses its significance as an indication of the origin of goods sold by and associated with the mark owner, such as when the owner makes the mark the subject of an unrestricted license or sale to others . . . or the mark has become generic, . . . or the owner assigns the mark without the goodwill associated with it . . . . Under such circumstances the mark is held to have been abandoned for the reason that there are no rights in a trademark apart from the business with which the mark has been associated and the use of the mark by the assignee in connection with a different goodwill and different product would result in a fraud on the purchasing public who reasonably assume that the mark signifies the same thing, whether used by one person or another.

*Defiance Button,* 759 F.2d at 1059 (internal quotations and citations omitted).

The language of the statute and elucidations in the case law make clear that a trademark indicates not the goods themselves but the source of the goods or, in other words, the business with which the good is associated. *See Id.;* 15 U.S.C. §1127 ("Trademark"); *See also McCarthy on Trademarks and Unfair Competition* § 3.9 (4th ed.2017)(Primary purpose of a trademark is not to describe the nature of goods and services but, in a sense, to answer the questions "Where

do you come from? Who is responsible for your creation and quality?"). Accordingly, I conclude the MIGRELIEF trademark indicates Quantum and not, as Akeso argues, the Patented Formula. Furthermore, there is no evidence in the record that the MIGRELIEF trademark has become generic or that Quantum has made the mark the subject of an unrestricted license or an assignment in gross or that the trademark has otherwise lost its significance as an indication that Quantum is the source of the goods. Thus, Akeso's abandonment argument likewise fails. *See McCarthy on Trademarks and Unfair Competition* §§ 17.5-17.8 (4th ed.2017).

Akeso has produced no evidence that Quantum is not the sole owner of the MIGRELIEF trademark. Accordingly, summary judgment in favor of Quantum as to Akeso's Eleventh, Twelfth, Thirteenth and Fourteenth counterclaims is granted.

## VI. <u>Motion 6</u>

Quantum seeks partial summary judgment on its Second Claim which alleges trademark infringement and unfair competition against Akeso for its use of the MIGRELIEF mark after Quantum revoked its authority to use the mark on March 3, 2016. As discussed above, I have concluded that there are material issues of fact regarding what agreement, if any, the parties had regarding transfer or sale of the MIGRELIEF trademark to Akeso. Because issues central to Quantum's Second Claim for Relief are interwoven with questions of the rightful ownership of the trademark after the parties' business relationship ended, I deny Quantum's motion for summary judgment as to its Second Claim for Relief.

## VII. <u>Motion 7</u>

Quantum's seventh sub-motion seeks summary judgment regarding Akeso's counterclaims of trademark infringement, unfair competition, and unfair and deceptive trade practices under state, federal and common law concerning Quantum's use of the PURACOL

trademark. Akeso argues that with termination of the 2002 Contract on November 30, 2015, Quantum was no longer authorized to use the PURACOL trademark unless the parties reached a new agreement. It asserts, however, that Quantum continued to use the trademark in commerce, including on its website. Akeso asserts and has produced evidence that even after it issued a June 30, 2016 Cease and Desist Letter, Quantum continued to use the PURACOL trademark in the URL address and associated metatags for the Migrelief product page on its website. Brian Decl. Exs. 17, 19, 20.

Quantum maintains that it only used the PURACOL mark to sell out existing inventory of Akeso's formulation, which it asserts it was entitled to do. Quantum also asserts and has produced evidence that its new formulation is sold in a new bottle with no references to feverfew or PURACOL. Shaw Decl. ¶39, Ex. 25. In a sworn declaration, Quantum's CEO, Jason Pellegrini, asserts that the appearance of PURACOL in the metatag Akeso points to was an inadvertent remnant that was overlooked during the website update. He states that Quantum was unaware of the presence of the PURACOL trademark in the site's metatags until Akeso filed its Response brief. Quantum asserts that the error was then immediately addressed. Pellegrini Decl. ¶2.

Trademark infringement **may** be premised on the use of a trademark in a website's metatags. *See Brookfield Commc'ns, Inc. v. W. Coast Entm't Corp.,* 174 F.3d 1036, 1061-1065 (9th Cir. 1999)(Lanham Act bars defendant's inclusion in its metatags any term confusingly similar to plaintiff's trademark). Under the circumstances of this case, however, there remain genuine issues of material fact concerning the extent and effect of any use of the PURACOL trademark by Quantum. Accordingly, Quantum's motion for summary judgment on Akeso's Fifteenth, Sixteenth, Seventeenth and Eighteenth Counterclaims is denied.

OPINION AND ORDER – 19

**VIII. <u>Motion 8 – Statute of Limitations</u>**

The eighth sub-motion asserts that Akeso's contract claims for alleged breaches prior to August 31, 2012 are barred by the statute of limitations. Quantum therefore seeks partial summary judgment on Akeso's Second, Third, Fourth, Ninth and Tenth Counterclaims. The parties previously briefed the Court on their positions regarding the proper limitations period. Quantum asserts that because the predominant purpose of the 2002 Contract between the parties was for the sale of goods, including their distribution, the four-year statute of limitations imposed by the Uniform Commercial Code (UCC) applies. Akeso asserts that it is the six-year statute of limitations period for contract claims under Oregon law that applies. *See* ORS §12.080(1).

Chapter Two of the UCC, as adopted under Oregon law, applies only to transactions in the sale of goods. Or. Rev. Stat. §72.1020. When a contract involves both goods and services, a court should "look to the essence of the agreement." *RRX Industries, Inc. v. Lab–Con, Inc.*, 772 F.2d 543, 546 (9th Cir. 1985). Here, the dispute between the parties centers primarily on rights to the MIGRELIEF trademark and on Quantum's alleged distribution outside channels to which it was purportedly limited. I thus conclude that the sale of goods was not the predominant purpose of any agreement at issue here. Accordingly, Quantum's Motion 8 is denied and a six-year statute of limitations will be applied to any surviving breach of contract counterclaims.

**IX. <u>Motion 9 – Injunctive Relief</u>**

Quantum seeks dismissal of Akeso's Nineteenth Counterclaim, arguing that injunctive relief is not a cause of action.  Akeso concedes this point.  This counterclaim fails as a matter of law and Quantum's motion for summary judgment as to this counterclaim is granted.

**<u>Conclusion</u>**

For the reasons set out above, Quantum's motion for summary judgment (#56) is

DENIED in part at GRANTED in part.


DATED this 5th day of June, 2017.


                                          /s/ John Jelderks
                              _____
                              John Jelderks
                              U.S. Magistrate Judge


OPINION AND ORDER – 21