IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

QUANTUM, INC., an Oregon corporation ) Civil No.: 3:16-cv-00334-JE
                                      )
    Plaintiff, Counterclaim Defendant, )   FINDINGS OF FACT,
                                      )   CONCLUSIONS OF LAW,
                                      )   OPINION AND ORDER
                                      )
                                      )
            v.                        )
                                      )
AKESO HEALTH SCIENCES, LLC, a         )
California corporation,               )
                                      )
    Defendant, Counter-Claimant.      )
                                      )
_____ )


    Jon P. Stride, Steven Olson, Sarah Einowski
    Tonkon Torp LLP
    1600 Pioneer Tower
    888 SW Fifth Avenue, Suite 1600
    Portland, OR 97204-2099

        Attorneys for Plaintiff/Counterclaim Defendant


    Aaron M. Brian, Staci Jennifer Riordan
    Nixon Peabody LLP
    300 South Grand Avenue, Suite 4100
    Los Angeles, CA 90071-3151

        Attorneys for Defendant/Counter-Claimant

FINDINGS OF FACT, OPINION AND ORDER -- 1

JELDERKS, Magistrate Judge:

Akeso Health Sciences, LLC is a California limited liability company and is the successor in interest to PR-Osteo (collectively referred to as "Akeso"). Akeso is in the business of developing and selling nutritional supplements. Curt Hendrix is the Chief Science Officer and primary spokesperson for Akeso. Quantum is an Oregon corporation based in Eugene, Oregon that is in the business of selling natural health products. Its president and primary spokesperson is David Shaw.

This case involves numerous claims and counterclaims brought by Plaintiff /Counter-Defendant Quantum and Defendant/ Counter-Claimant Akeso relating to their long-term business relationship involving the sale and distribution of a natural migraine relief formula. For ease of reference, the claims and counterclaims are listed below.

### Claims and Counterclaims

#### I. Quantum's Claims

**Claim One** seeks a declaration under the Declaratory Judgment Act that the 2002 Contract between the parties expired on October 31, 2004.

**Claim Two**:

**Count One**: Trademark Infringement of the MigreLief trademark under 15 U.S.C. §1114.

**Count Two:** Unfair Competition in violation of 15 U.S.C. §1125(a). Quantum alleges Akeso's use of the MigreLief trademark after its right to do so terminated has caused and will continue to cause customer confusion.

**Count Three:** Common law trademark infringement and unfair competition through Akeso's wrongful use of the MigreLief trademark.

## II. Akeso's Counterclaims

**Count 1:** Declaratory Relief under the Declaratory Judgment Act that the 2002 Contract is valid and enforceable.

**Count 2:** Breach of Contract/Specific Performance. Akeso seeks an Order that Quantum sell to Akeso the MigreLief trademark and any common law trademark rights to MigreLief for the price of $25,000.

**Count 3:** Breach of contract through sales to improper accounts.

**Count 4:** Breach of implied covenant of good faith and fair dealing through failure to honor the 2002 Contract and the trademark purchase provisions therein.

**Count 5:** Promissory Estoppel. Akeso alleges Quantum failed to fulfill promises with respect to Akeso's right to purchase the MigreLief trademark for $25,000 or a later agreement to transfer the trademark to Akeso at no cost. Akeso seeks an Order that Quantum specifically perform in conformity with the terms of the 2002 Contract or in an alternative manner deemed equitable by the Court. Akeso alternatively asks the Court to grant it the right to continue using the MigreLief trademark and/or transfer to Akeso the MigreLief trademark, the trademark application, any common law trademark rights and the goodwill attached.

**Count 6:** Equitable Estoppel. Akeso asks the Court to order that Quantum specifically perform in conformity with the terms of the 2002 Contract or in an alternative manner deemed equitable by the Court with respect to Akeso's right to purchase or receive the MigreLief trademark. Akeso alternatively asks the Court to grant it the right to continue using the MigreLief trademark and/or transfer to Akeso the MigreLief trademark, the trademark application, any common law trademark rights and the goodwill attached.

**Count 7:** Cancellation of MigreLief trademark. Akeso alleges that Quantum has not engaged in

substantially exclusive use or controlled the quality of the use of the MigreLief trademark and has not had the use in commerce required to support the trademark registration. Akeso asks the Court to cancel and invalidate the MigreLief trademark or, alternatively, to grant Akeso the right to continue using the trademark due to its invalidity.

**Count 8**: Cancellation of MigreLief trademark application.  Akeso alleges Quantum has filed a second application for the MigreLief trademark. It seeks a declaration that Quantum's continuing efforts to register the MigreLief trademark are an infringement of Akeso's rights and seeks an Order enjoining Quantum from filing further documents with the USPTO to complete or sustain registration of the MigreLief trademark.

**Count 9**: Breach of Implied Contract/Specific Performance. Akeso seeks an Order compelling Quantum to sell or transfer to Akeso the MigreLief trademark, any common law trademark rights and the goodwill attached.

**Count 10**: Breach of Implied Contract through sales to improper accounts. Akeso alleges Quantum breached the parties' implied contract by selling MigreLief tablets outside the agreed upon sales channels.

**Count 11**: Federal Trademark Infringement of the MigreLief trademark. Akeso alleges that it is the rightful owner of the MigreLief trademark. It further alleges that Quantum is selling under the MigreLief trademark and with the same or similar packaging, marketing and sales materials, a tablet containing an alternate formula to the Patented Formula.

**Count 12**: Akeso alleges Quantum engaged in unfair competition in violation of 15 U.S.C. §1125(a) through use of the MigreLief trademark on tablets containing the Alternate Formula.

**Count 13**: Akeso asserts common law trademark infringement and unfair competition claims regarding use of the MigreLief trademark on Alternate Formula tablets.

FINDINGS OF FACT, OPINION AND ORDER -- 4

**Count 14**: Akeso alleges Quantum violated state unfair and deceptive trade practices laws through its alleged use of the MigreLief trademark.

**Count 15**: Federal Trademark Infringement of the PURACOL trademark. Akeso alleges Quantum is using Akeso's PURACOL trademark to sell migraine relief tablets similar to what Akeso sells using the same trademark.

**Count 16**: Akeso alleges Quantum engaged in unfair competition in violation of 15 U.S.C. §1125(a) with respect to the use of Akeso's PURACOL trademark.

**Count 17**: Akeso asserts common law trademark infringement and unfair competition claims regarding Quantum's alleged use of the PURACOL trademark.

**Count 18**: Akeso alleges Quantum violated state unfair and deceptive trade practices laws through its alleged use of the PURACOL trademark.

**Count 19**: Akeso seeks injunctive relief.

<u>**Procedural Background**</u>

On March 31, 2017, Quantum filed a motion for summary judgment which this Court granted in part and denied in part by Opinion and Order dated June 5, 2017. (Dkt. #122). The Court's Order resolved in Quantum's favor Quantum's Claim One and Akeso's Counterclaims 1, 2, 3, 4, 6, 11, 12, 13, 14, and 19. The Court then decided that trial on the remaining issues would be bifurcated with questions regarding trademark infringement being reserved for phase two. Due to the Court's concern regarding the parties' disagreement as to whether Akeso was entitled to a jury trial on Counterclaim 9, the Court advised the parties at the pretrial conference that, pursuant to the discretion granted it by Fed. R. Civ. Pro. 39(c), it would most likely consider the jury's verdict on that claim to be advisory.

> THE COURT: So even if the jury decided question two, in Akeso's -- question two – I mean, claim two, in Akeso's favor, I would probably make an independent

determination. At least I would give it more thought, whether it was incumbent on
me to make that independent determination, so that if there was an appeal, the
case wouldn't be sent back by the Court of Appeals . . . . So I'm just putting that
out there so it doesn't come as a surprise if we have some argument and issues of
that nature after the jury comes in with a verdict.

\* \* \*

Do you understand what I'm saying?

MR. BRIAN: I do, Your Honor.

THE COURT: Mr. Stride?

MR. STRIDE: I understand, Your Honor . . . .

(Pretrial Trans. 89:2-13; 89:24-90:2).

A jury was empaneled and trial was held June 6, 7, 8, 9 and 12, 2017 on Akeso's

Counterclaims 5, 9 and 10. As Akeso's counterclaims were the only issues for trial, it presented

its case first. The jury heard evidence regarding Counterclaims 9 and 10. At the close of Akeso's

case Quantum moved for judgment as a matter of law or, in the alternative, on the merits on

Counterclaims 9 and 5 and a potential unjust enrichment claim. (Dkt. #134). The Court denied

the motion and again indicated that even though Counterclaim 9 may go to the jury, the Court

was inclined to treat the jury's verdict on that issue as advisory. (Trans. 437:15-438:16). At the

close of the evidence presented to the jury, Quantum renewed its motion for judgment as a

matter of law or, alternatively, on the merits, which the Court again denied. (Trans. 683:7-15).

On June 12th, while the jury was deliberating, additional evidence was presented to the Court

concerning Counterclaim 5 and proposed Counterclaim 20.

On June 12, 2017, the jury returned a verdict awarding Akeso damages on Counterclaim

10 in the amount of $504,381.00. The jury also returned a verdict in Akeso's favor on

FINDINGS OF FACT, OPINION AND ORDER -- 6

Counterclaim Nine, determining that the parties had an implied contract which required Quantum to transfer the MigreLief trademark to Akeso for $25,000. (Trans. 836:11-837:13).

Although the jury's verdict resolved the issue as to out of channel sales, there are several issues for resolution by the Court involving the MigreLief trademark and minor issues involving Akeso's PURACOL trademark. At a July 11, 2017 status conference, after allowing submission of post-trial briefing, the Court discussed the terms of a potential judgment and took additional argument. The Court also granted leave to submit additional briefing on certain discrete issues. The parties submitted subsequent briefing by letter.

Pursuant to Fed. R. Civ. P. 52(a), the Court now sets forth its findings of fact, conclusions of law, and opinion and order as to all remaining issues.

## I. Implied Contract – Specific Performance

The Court has concluded that the issue regarding transfer of the trademark is an equitable issue to be decided by the Court. As explained below, the Court has determined that the parties had an implied contract which allowed Akeso to ultimately own the MigreLief trademark. Although it is clear that the parties both intended for Akeso to end up owning the trademark, they never reached a final agreement as to the details of the transfer. The Court is exercising its equitable power to fill in what it considers to be, within the greater context, minor details of the agreement.

The jury's role as to Counterclaim 9 was purely advisory. The Court agrees with the jury's conclusion that there is clear and convincing evidence that there was an implied contract to transfer the MigreLief trademark to Akeso. However, the Court does not agree that Akeso proved by clear and convincing evidence that the implied contract dictated transfer of the trademark for $25,000 and, therefore, the Court's final decision on Akeso's Ninth Counterclaim

departs from the jury's advisory verdict on that issue.

Akeso asserts that treatment of the jury as advisory would be obvious procedural error because "[i]n the Ninth Circuit, Rule 39 requires that the Court notify the parties the jury will be advisory before the onset of trial, and certainly before the verdict is reached." (Akeso Letter to Court of July 14, 2017). The Court has considered this argument carefully and disagrees.

Rule 39(c) does not expressly require advance notice to the parties of the court's intention to treat the jury as advisory. See Fed. R. Civ. Pro. 39(c); *Merex A.G. v. Fairchild Weston Sys., Inc.*, 29 F.3d 821, 827 (2d Cir. 1994). The Ninth Circuit has not expressly addressed this issue but has found in a similar context that because of the "significant tactical differences in presenting a case to a court, as opposed to a jury[,] the parties are entitled to know at the outset of the trial whether the decision will be made by the judge or the jury." *Pradier v. Elespuru,* 641 F.2d 808, 811 (9th Cir.1981). Nevertheless, multiple circuits have held that failure to give parties advance notice, absent demonstrable prejudice, is not a basis for reversal. *Merex A.G.,* 29 F.3d at 827; *Indiana Lumbermens Mut. Ins. Co. v. Timberland Pallet & Lumber Co.*, 195 F.3d 368, 375 (8th Cir. 1999). Here, Akeso was on notice no later than at the pretrial conference that the Court would most likely treat the jury as advisory on the Ninth Counterclaim. Thus, there was no "demonstrable prejudice."

If Akeso was correct that it was entitled to a jury determination rather than an equitable decision by the Court on the issue of the transfer of the MigreLief trademark, I would conclude, in the alternative, that Quantum was entitled to judgment as a matter of law, due to a failure of proof as to the $25,000 portion of the jury's verdict.[1]

---

[1] The Court's decision to address the jury issue in this manner was dictated by considerations of judicial efficiency and practicality. If the Court had not allowed Akeso to try the trademark issue in front of a jury and, on review, this determination was found to be erroneous, a second trial would be required, at greater expense to the parties and in detriment to the efficient use of judicial resources. If a reviewing court were to determine that Akeso had a right to a

FINDINGS OF FACT, OPINION AND ORDER -- 8

The jury in this case found that the parties impliedly agreed to a transfer of the trademark and the Court agrees with that conclusion. Nevertheless, while a term entitling Akeso to ultimately obtain the trademark was a certain and definite aspect of the parties' implied contract, the monetary consideration, if any, necessary for such transfer was not. Therefore, the Court does not independently agree with or adopt that portion of the jury's verdict.

**A. Conclusions of Law**

Under Oregon law, a contract must be based on the parties' communications and overt acts. *Ken Hood Const. Co. v. Pac. Coast Const., Inc.,* 201 Or. App. 568, 578, 120 P.3d 6 (2005), *opinion adhered to as modified on reconsideration,* 203 Or. App. 768, 126 P.3d 1254 (2006). Courts will not consider the parties' "uncommunicated subjective understanding." *Newton/Boldt v. Newton,* 192 Or. App. 386, 392, 86 P.3d 49 (2004) (internal citation omitted).

An implied-in-fact contract has the same legal effect as an express contract. *Staley v. Taylor,* 165 Or. App. 256, 262, 994 P.2d 1220 (2000) (citing Restatement (Second) of Contracts § 4 comment a (1979)). Like an express contract, an implied contract "is based on mutual expressions of assent. That assent and the terms of the parties' agreement may be inferred from the parties' conduct." *Jaqua v. Nike, Inc.*, 125 Or. App. 294, 297, 865 P.2d 442 (1993); *see also Staley v. Taylor,* 165 Or. App. 256, 262 n.6, 994 P.2d 1220 (2000) ("Frequently, implied-in-fact contracts arise because an accepted course of conduct would permit a reasonable [fact-finder] to find that the parties understood that their acts were sufficient to manifest an agreement."). A party may manifest its assent to an implied in fact contract over time through its course of conduct. *Montez v. Roloff Farms, Inc.,* 175 Or.App. 532, 536–37, 28 P.3d 1255 (2001).

---

jury trial on the trademark issue it could also determine whether the evidence was sufficient to support the jury's verdict.

An implied-in-fact contract can also arise when a written agreement expires and, without more, the parties continue to perform as before. Depending on the conduct of the parties, the implied contract might incorporate some or all of the terms and conditions of the expired express contract. *Nat'l Union Fire Ins. Co. v. Showa Shipping Co.,* 166 F.3d 343, n.6 (9th Cir. 1999) (citing with approval *Martin v. Campanaro,* 156 F.2d 127, 129 (2d Cir.1946) (New York law) and *Cloverdale Equip. Co. v. Manitowoc Eng'g. Co.,* 964 F.Supp. 1152, 1162 (E.D.Mich.1997) (Michigan law)). However, the contract "must be definite in all material aspects," with nothing material left to future negotiation. *Povey v. Clow*, 146 Or. App. 760, 763-64, 934 P.2d 528 (1997) (requirements for specific performance of a contract).

The general rule is that all elements of a claim for specific performance must be proved by clear and convincing evidence. *See Riverside Homes, Inc. v. Murray*, 230 Or. App. 292, 301, 214 P.3d 835 (2009); *Murray v. Laugsand*, 179 Or. App. 291, 294, 39 P.3d 241 (2002). However, this rule is not as strict as it sounds when combined with Oregon law dealing with implied contracts and the equitable power of the court.

The signed September 2005 "MigreLief Agreement Memo" memorialized the parties' contemplated transfer of the trademark in an anticipated future contract. The Agreement Memo in all terms other than the release provision was explicitly not, however, a final agreement. Although agreements to agree are generally not enforceable in and of themselves, the terms of the signed September 2005 Agreement Memo serve as the underpinning of an implied contract that formed through the parties conduct over the next 10 plus years, particularly when viewed in light of their conduct in the three years leading up to the 2005 Agreement Memo.

Virtually every written document recording the parties' intent as to the terms of a future written contract includes the transfer of the MigreLief trademark from Quantum to Akeso.

FINDINGS OF FACT, OPINION AND ORDER -- 10

Furthermore, the evidence shows that there were three constant aspects to the parties' business relationship spanning more than 13 years: 1) Quantum would have the right to sell Akeso's patented formula under the MigreLief trademark; 2) Quantum would be restricted to certain sales channels for their sales of MigreLief tablets; and 3) by some means, Akeso would end up owning the MigreLief trademark. In addition, Akeso utilized and developed the MigreLief trademark as if it were its own, securing MigreLief domain names, putting considerable effort into marketing and building confidence in the brand, and attaching the MigreLief name to other products it developed and sold that were not sold by Quantum. I find credible both the testimony that Quantum never told Akeso that it was unwilling to transfer the trademark and the testimony that Quantum never specifically affirmed that Akeso had the continued right to purchase the trademark. However, I conclude that Quantum's acquiescence in and acknowledgment of Akeso's treatment of the trademark, coupled with the absence of any specific denial to Akeso's repeated assertions that the trademark would transfer, constitutes overt conduct manifesting assent. *Staley*, 165 Or. App. at 262 n.6 ("Frequently, implied-in-fact contracts arise because an accepted course of conduct would permit a reasonable juror to find that the parties understood that their acts were sufficient to manifest an agreement."). Accordingly, I conclude, as the jury did, that the implied contract included a term that entitled Akeso to obtain the MigreLief trademark.

As noted above, despite concluding that the parties impliedly agreed to a transfer of the trademark, the Court does not independently agree with or adopt the portion of the jury's verdict that found, under a clear and convincing standard, that $25,000 monetary consideration for such a transfer was a certain and definite aspect of the parties' implied contract. However, under the circumstances of this case, the absence of certainty as to this detail does not defeat Akeso's implied contract claim. Once the parties began doing business, the potential monetary

FINDINGS OF FACT, OPINION AND ORDER -- 11

consideration was a relatively minor issue.

Akeso requests specific performance on its implied contract claim. Although there has been some contrary discussion, it is clear from the pleadings, the arguments and the law that this claim is in equity. Since specific performance is an equitable remedy, this Court sitting in equity has broad discretion to "fashion equitable remedies based upon rules different from those applied for remedies at law." *Cameron v. Benson*, 295 Or. 98, 103, 664 P.2d 412 (1983). This is so because "the general principle underlying equitable remedies . . . is to grant such relief as will best accomplish the ends of justice." *Id.* (citations omitted).

Although a contract must be definite in all <u>material</u> respects, the law "leans against * * * the destruction of contracts because of uncertainty; and it will, if feasible, so construe agreements as to carry into effect the reasonable intentions of the parties if that can be ascertained." *Delmar Crawford, Inc. v. Russell Oil Co.,* 106 Or. App. 524, 527, 808 P.2d 1021 (1991)(internal citations and quotations omitted); *see also,* 25 Williston on Contracts § 67:5 (4th ed.). Furthermore, "[w]hen the conduct or expressions of parties to an agreement indicate a sufficient intent to make a contract, a court has latitude to fill in the gaps and, by its decree of specific performance, to formulate subordinate details of the agreement." *Yeon St. Partners v. Envtl. Consulting Servs., Inc.*, 125 Or. App. 501, 505, 865 P.2d 1325 (1993)(citations omitted); *see also, Booras v. Uyeda,* 295 Or. 181, 192, 666 P.2d 791 (1983). In compelling circumstances, a court may make definite subordinate details of an agreement by using "'courageous common sense' to imply fair and reasonable terms that give effect to the parties' intentions." *Dalton v. Robert Jahn Corp.*, 209 Or. App. 120, 140, 146 P.3d 399, 411 (2006)(quoting *Hughes,* 189 Or.App. at 266, 76 P.3d 111 (citation omitted)); *see also* Restatement (Second) of Contracts § 362 (1981). Following the guidance of the above-cited case law and applying this Court's own common sense and notions of

FINDINGS OF FACT, OPINION AND ORDER -- 12

justice, I conclude that although the agreement concerning the monetary consideration necessary for transfer of the MigreLief trademark was indefinite, it is within my discretion to order specific performance to effect the parties' intent. As I have previously indicated, the evidence is clear and convincing that the parties intended for Akeso to end up owning the trademark.

The question thus becomes one of inferring the parties' intent regarding the monetary consideration, if any, to be given to Quantum for transfer of the trademark. After an extensive and detailed review of the documentary evidence and testimony at trial, I have concluded that monetary consideration in an amount of $100,000 is a "fair and reasonable term[] that give[s] effect to the parties' intentions." *Dalton*, 209 Or. App. at 140. The July 2005 Memo Agreement draft that was prepared by David Shaw contemplates the immediate transfer of the trademark from Quantum to Akeso without mention of price and provides that if Akeso cancels for any reason other than breach they may retain the trademark in exchange for a $100,000 fee. (Tr. Ex. 397). Shaw had communicated in an email two weeks prior his amenability to the transfer of the trademark with ownership returning to Quantum if Akeso cancelled for reasons other than noncompliance. (Tr. Ex. 11). At trial, Shaw described the July 2005 draft as the beginning of negotiations and acknowledged that if this agreement had come to be, Akeso would have immediately owned the trademark. (Trans. 562:5-6; 562:9-13). He noted the $100,000 fee, testifying "you'll notice the price changed. We were looking for more." (Trans. 562:6-7). Shaw emphasized that the term was meant to provide a consequence that would protect the trademark, testifying that "I was not giving this thing away for nothing. There was always some kind of something attached to it." (Trans. 563:3-4).

Although, the July 2005 Agreement memo draft was just that, a draft, it communicates Quantum's willingness to transfer the MigreLief trademark to Akeso for no money upon the

signing of a final agreement and assigns a $100,000 retention cost for Akeso to keep the trademark with no strings attached. I recognize that neither the subsequent signed September 2005 Agreement Memo prepared by Quantum or the Distribution Agreement prepared by Akeso and revised by Quantum contain the $100,000 fee. These documents all do, however, contain provisions that would, upon finalization of the contemplated future agreement, transfer the trademark to Akeso. These documents, as well as the parties' entire prior history, are totally inconsistent with David Shaw's trial testimony that "it was always in my mind to control that mark . . . ." (Trans. 559:20-21). The specification of the $100,000 sum indicated Quantum's valuation for a no-strings-attached transfer of ownership at a time in close proximity to three written documents that were either prepared or edited by Quantum and that reflect Quantum's willingness to transfer the trademark to Akeso. The terms of the July 2005 Agreement Memo draft, the September 2005 Agreement Memo, the detailed October/November 2005 Distribution Agreement and David Shaw's redline edits of that document, though not binding in and of themselves, adequately convey the parties' intentions regarding the trademark. These written documents, supported by the evidence presented at trial of the value of the brand to each party and of each party's conduct vis-à-vis each other and the trademark, itself, satisfy this Court that the sum of $100,000 is a fair amount to give effect to both parties' intentions. [2]

Additionally, it is evident to me that denying equitable relief in this case would cause severe harm to Akeso. "Courts of equity may examine the effect of granting or denying equitable relief." *Yeon St. Partners*, 125 Or. App. at 506. (citing *Public Market Co. v. Portland*, 160 Or. 155, 167, 83 P.2d 440 (1938)). Without MigreLief, the name attached to its primary product line,

---

[2] In addition, Akeso has invited this Court to choose an amount "it deems just" for which Quantum must transfer the trademark. (Akeso's Supplemental Post-trial Brief at 20, Dkt. #152). Likewise, Quantum has little room to complain because the Court is awarding it the highest monetary value it ever placed on the trademark when a non-frivolous argument can be made to fix the compensation at zero.

FINDINGS OF FACT, OPINION AND ORDER -- 14

Akeso would lose its significant investment in the brand and, potentially would have to rebuild its entire business.

 This Court concludes that the parties had an implied-in-fact contract that included an agreement to transfer the MigreLief trademark to Akeso. Furthermore, the Court, invoking its equitable powers and mindful of the fact that Quantum benefited from its ability to sell Akeso's patented formula for over a decade, determines that the parties' intent is best accomplished by setting fair and reasonable monetary consideration for that transfer at $100,000. Accordingly, upon proof that Akeso is "ready, willing, and able"[3] to tender payment in the amount of $100,000 or is agreeable to having the Court reduce the jury's verdict on Counterclaim 10 by $100,000, the Court will grant Akeso's request for specific performance and will order Quantum to transfer to Akeso United States Trademark Registration No. 2,002,902 and United States Trademark Application Serial No. 86/857160 in accordance with Section 10 of the Lanham Act (15 U.S.C. §1060).

**B. Findings of Fact**

 The following findings of fact support the conclusion that the implied contract between Akeso and Quantum included a term that entitled Akeso to purchase the MigreLief trademark from Quantum and that $100,000 is a fair and reasonable amount for Akeso to pay to effect the transfer.

 Prior to 2002, Akeso owned the patent to a migraine relief formula it registered under the trademark PURACOL and Quantum owned the trademark MigreLief. (Joint Pretrial Order, Dkt. #93).

 The parties thought that it was in their mutual interest for each of them to market a migraine relief product using Quantum's trademark, Akeso's patented formula, and with each

---

[3] *Riverside Homes, Inc. v. Murray,* 230 Or. App. 292, 301, 214 P.3d 292 (2009).

FINDINGS OF FACT, OPINION AND ORDER -- 15

party selling in certain designated sales channels. (Id.).

The parties' contemplation of the transfer of the trademark dates from the beginning of their business relationship. An undated, unsigned document that preceded their 2002 Letter Agreement states "[Akeso] wishes to purchase the name Migrelief from Quantum, Inc. The companies have agreed that Quantum will transfer ownership of the name to [Akeso] in exchange for certain distribution rights of the [Akeso] product known as Migra-Lieve. In order to facilitate this action, Quantum will license the [trademark to Akeso] for a 30-month period after which ownership of the [trademark] shall transfer to [Akeso.]" (Tr. Ex. 2, p.1).

The parties' early intentions are also outlined in a July 6, 2000 email from David Shaw to Curt Hendrix in which Shaw writes ". . . we would be amenable to your request to sell you all rights to our trademarked name, Migrelief . . . . [W]e feel that a price of $25,000 would be fair . . . ."

In February, 2002, they reduced their agreement to writing in what is referred to as the "Letter Agreement." (Joint Pretrial Order, Dkt. #93). The Letter Agreement states "If [Akeso] chooses to cancel this agreement it may continue to use the trademark by purchasing all rights to the trademark from Quantum for $25,000." (Tr. Ex. 4, p.2).

This Court has ruled that the Letter Agreement expired by its own terms in October 2004. (Opinion and Order, Dkt. # 122).

On May 4, 2004, Akeso proposed to Quantum a new agreement with Akeso acquiring the MigreLief trademark "for no money in perpetuity" based on Akeso paying Quantum a royalty on certain sales and allowing Quantum to continue marketing MigreLief in health food stores. (Tr. Ex. 6).

FINDINGS OF FACT, OPINION AND ORDER -- 16

On July 28, 2004, Akeso summarized its expectations regarding its continued business relationship with Quantum in an email to Shaw. Point 3 states "[Akeso] gets the rights to the Migrelief trademark, which it will license to Quantum in perpetuity. For this, [Akeso] will pay Quantum $1.50 per bottle sold through VMS stores over the next two years." (Tr. Ex. 7). Shaw responded to each of Akeso's points by email on August 3, 2004, stating "[Point]3. OK, but if you go out of business you turn trademark to us." He also wrote "I think that if we are going to give you the trademark . . . then you should drop the minimum purchase requirement." (Id.).

The above communications did not lead to a new agreement and on November 29, 2004, Quantum contacted Akeso suggesting an interim agreement in which Quantum would "have the rights to continue as the exclusive distributor" of the MigreLief product in certain sales channels and, in turn, Quantum would extend Akeso's right to the use the MigreLief trademark. Quantum did indicate that a contract was in the works which would transfer the trademark to Akeso with the trademark returning to Quantum if Akeso went out of business. Quantum indicated that the agreement should be drawn by Akeso's attorneys and submitted to Quantum for review. There is no indication in the record that Akeso followed up on these 2004 proposals and counter proposals. (Tr. Ex. 204).

By letter of April 29, 2005, Akeso's lawyer wrote to Quantum stating that the 2002 Letter Agreement was still in effect and that Akeso's right to purchase the trademark for $25,000 remained in place. (Tr. Ex. 9). Shaw conceded at trial that he received this letter in April of 2005. (Trans. 40:20-41:16). There is no evidence that Quantum responded in writing to this letter, and Shaw could not recall if he spoke with Hendrix about the letter. (Trans. 42:4-6).

On June 28, 2005, Akeso contacted Quantum with seven major points which required Quantum's agreement in order to proceed to a contract. Point 4 was that "[w]e get ownership of

FINDINGS OF FACT, OPINION AND ORDER -- 17

trademark immediately, which we license back to Quantum as long as they remain licensee of MigreLief." (Tr. Ex. 10). Quantum responded on June 29, 2005, stating, as to Point 4, "we'll assign all rights for the Migrelief name to you but the agreement should unequivocally state that if you cancel the agreement while we are in compliance, ownership returns to us." (Tr. Ex. 11).

The record includes an unsigned document prepared by Quantum titled "MigreLief Agreement Memo July 12, 2005." Paragraph 7 reads, "Trademark Transfer: Upon signing of a new agreement, Quantum will transfer registration of the MigreLief trademark to AH[4] and AH will license the right to use the trademark back to Quantum. If AH cancels this agreement for any reason other than breach, AH will transfer the trademark registration back to Quantum immediately or pay Quantum a fee of $100,000." The last sentence in Paragraph 3 states, "This memo releases both parties from prior agreements and any and all obligations." (Tr. Ex. 397).

On September 27, 2005, the parties signed a document prepared by Quantum titled "MigreLief Agreement Memo." It is a modified version of the July 12th unsigned memo. Paragraph 3 continues to state, "This memo releases both parties from prior agreements and any and all obligations." Paragraph 7 was modified to read, "Trademark Transfer: Upon signing of a new agreement, Quantum will transfer the registration to the Migrelief trademark to AH and AH will license the right to use trademark back to Quantum as long as Quantum remains licensee. If AH cancels this agreement for any reason other than breach or expiration, AH will transfer the trademark registration back to Quantum." Paragraph 13 states, "This document is not the final agreement." Paragraph 14 states that Akeso will prepare and submit a final agreement within six weeks. (Tr. Ex. 213).

In October or November of 2005 (within six weeks of the agreement to agree) an extensive 25 page document titled "Distribution Agreement," was prepared for Akeso and

[4] AH refers to Akeso Health. (Trans. 563:17-18).

FINDINGS OF FACT, OPINION AND ORDER -- 18

modified by Quantum with redline changes. (Tr. Ex. 220; Trans. 564:8-565:1). The unsigned November 2005 draft "Distribution Agreement," contemplated that the parties would enter into a contemporaneous Trademark Purchase Agreement that would transfer the MigreLief trademark to Akeso. (Tr. Ex. 220). Paragraph D of the document states, "Concurrently, herewith, and as further consideration and a condition hereto, the Parties shall enter into that certain Trademark Purchase Agreement of event date herewith." There is no such agreement in the record and, obviously, if one was prepared it was not signed by the parties. While the "Distribution Agreement" does not purport to govern such a transfer, the document does contain a detailed section titled "TRADEMARKS AND BRANDING" that discusses Akeso's license of the MigreLief trademark back to Quantum. (Id.). Although Quantum made changes to other sections of the initial draft, this section reflects no changes or objections by Quantum to the terms transferring the trademark to Akeso. The document also states that if the Agreement expires or is terminated Quantum will have no further right to use the MigreLief trademark unless written consent is obtained from Akeso. Redline changes indicate only that the word "Trademarks" was changed to "Marks." (Id.). As noted above, this document was never signed and the record contains no additional evidence regarding the "Trademark Purchase Agreement" it references.

On March 2, 2007, Akeso contacted Quantum stating that the parties had been working without a contract regarding the distribution by Quantum of MigreLief into the health food store category and stated that in order for Quantum to continue to sell the patented formulation into that category, Quantum would need to assign the "Migrelief name" to Akeso. In exchange for the assignment and a price increase, Akeso would agree to allow Quantum to market Akeso's formulation for 36 months. Akeso (Hendrix) asked Quantum to contact him as soon as possible to discuss the price increase and assignment of the trademark. (Tr. Ex. 236).

FINDINGS OF FACT, OPINION AND ORDER -- 19

On March 3, 2007, an internal Quantum email from Shaw to Quantum's then-President, Eve McClure, indicates that Shaw spoke with Hendrix and that they discussed prices and quantities. In relation to the "deal," Shaw wrote "I told him a contract was a good idea but what did he have in mind after the three year period? He had no idea. I suggested we buy his business or he buy ours. . . . He wanted to think about buying ours." (Tr. Ex. 237).

Quantum's email to Hendrix on March 5, 2007 confirming the phone conversation only refers to prices and sales and does not mention the MigreLief trademark. In any event, the "Migrelief name" was not assigned to Akeso and Quantum continued to market Akeso's formulation for much longer than 36 months. (Tr. Ex. 238).

On May 2, 2014, Shaw prepared a document titled "CONFIDENTIAL MEMORANDUM: Migrelief" which was intended to be an internal Quantum document but was also inadvertently sent to Akeso. The memorandum discusses a variety of issues regarding the relationship with Akeso. In a section titled "Trademark Issues," the document states "[i]n 2005 Quantum attempted to renegotiate a new agreement including an enforceable licensing agreement with Akeso but Akeso abandoned the process and the result is that the two companies have been operating under a verbal agreement, as mentioned above." The section on trademark issues discusses a potential challenge to the trademark on the ground that Akeso is using it without adequate quality controls but discusses nothing about Akeso challenging the ownership of the trademark. The memorandum also addresses, "The importance of granting a license to AKESO" (the evidence suggests that the parties had been operating without a formal licensing agreement for many years) and has a section titled "The MigreLief brand power VS[sic] a new brand." This section has proven to be prophetic as it states,

> Petersen sees all sorts of potential issues with AKESO if we decide to market our
> own formula under the MigreLief brand. Petersen believes that AKESO would

FINDINGS OF FACT, OPINION AND ORDER -- 20

sue based on what they perceive as a long history of us only selling <u>his mark</u> and that the intent of the original arrangement was such. Petersen believes we would prevail but no guarantees. Even so, it has the potential to get very messy in many other unpredictable ways. Despite the license, Hendrix could disrupt our supply, or interfere with key retailers such as Vitamin Shoppe. I realize he'd be taking risks in doing so, but you just don't know. <u>It's his baby.</u> Keep in mind that <u>Hendrix has put considerable effort into gaining confidence for the brand</u> among health professionals and consumers.

(Tr. Ex. 68)(emphases added).

On June 3, 2014, Quantum (Shaw) emailed Akeso stating "Curt, I'm very open to a universal agreement. After speaking to our attorney, this agreement would be comprised of a trademark license as well as a patent agreement and these can be rolled into one agreement." (Tr. Ex. 280).

On August 19, 2014, Akeso (Hendrix) emailed Quantum (Shaw) with the subject "Discussion of potential new trademark license and product license agreements." As to the trademark, the email states,

> 1- In the original agreement, Akeso had the open ended right to purchase the trademark for $25,000. If we draft a new agreement, I would like for Akeso to continue to have that right. Akeso will agree that if it purchases the trademark, then Quantum will have the right to use it in the markets that it is licensed to sell MigreLief. (In essence, it is just flipping the roles of each of the companies).
> * * *
> 3-Akeso intends to whenever possible to continue to create MigreLief line extensions. . . It is not clear to me if a new trademark agreement has to take this into consideration but certainly a new product licensing agreement would have to limit Quantum to selling migraine formulations that fall under the patents.
> 4-If a new trademark agreement is reached it would need to be exclusive to Akeso.

(Tr. Ex. 284). The email concludes, "I cannot be certain that I have thought of every point that may come up in trying to agree on these two agreements but we had to start somewhere. (Id.). In an internal email dated the same day, Shaw indicated in response to Akeso's Point 1, "we won't do this." (Tr. Ex. 285).

FINDINGS OF FACT, OPINION AND ORDER -- 21

A letter from Akeso to Quantum dated November 30, 2015, gave notice that Akeso was terminating the 2002 Agreement and was exercising its right to purchase the MigreLief trademark for $25,000. The letter also explored the possibility of continuing the business relationship subject to certain terms. (Tr. Ex. 86).

A letter dated February 26, 2016, from Akeso's lawyer to Quantum's lawyer reasserted Akeso's belief that the 2002 Agreement was in effect until Akeso terminated it on November 30, 2015. (Tr. Ex. 300). It informed Quantum that Akeso was exercising its right to purchase all rights to the MigreLief trademark for $25,000. (Id.). The letter also stated that "Akeso is no longer interested in supplying product to Quantum." (Id.).

A third letter, from Quantum's lawyer to Akeso's lawyer dated March 3, 2016, indicated that Quantum disagreed with the statements in Akeso's letter and purported to revoke Akeso's permission to use the MigreLief trademark. (Tr. Ex. 302).

The parties had continued to do business with each other without a written contract from October 2004 until Akeso terminated the relationship by letter dated November 30, 2015. (Dkt. #93; Tr. Ex. 86). At no time prior to November 2015 did Quantum terminate the parties' ongoing contractual relationship. Quantum did not stop purchasing the Patented Formula or exercising its exclusive distribution and licensing rights. Nor did Quantum dispute Akeso's right to use the MigreLief trademark. (Dkt. #93).

During the course of the business relationship, Akeso developed and sold derivative products for specific customer categories that it sold under the MigreLief name, including MigreLief+M, Children's MigreLief, and MigreLief Now. (Trans. 130:9-131:25). Quantum only sold the original MigreLief product. (Trans. 131:21-22). Akeso sold its products in a number of ways including on its website, migrelief.com.

FINDINGS OF FACT, OPINION AND ORDER -- 22

The parties agree that they had an ongoing enforceable agreement regarding sales channels and that Quantum breached that agreement. (Id.). Quantum disagreed as to the extent of its breach but that issue was resolved by the jury's verdict on June 12, 2017, awarding Akeso $504,381.00 in damages. (Dkt. #145). There is no question regarding Akeso's permission to use Quantum's trademark or Quantum's permission to sell Akeso's patented product in designated channels prior to November 30, 2015.

The Court finds that any increase in the value of the trademark from 2005 to the time of trial was due primarily to the efforts of Akeso. Akeso spent considerable time, effort and an outlay of more than $1 million in promoting the trademark. During the parties' business relationship, the trademark was used exclusively on Akeso's patented formula and Akeso-developed variants of that formula. The MigreLief variants were marketed and sold exclusively by Akeso. (Trans. 130:9-131:25; 131:21-22).

The Court has weighed, evaluated, and considered all the evidence presented at trial and all of the arguments of counsel. Having completed its deliberation and based on its Findings of Fact and Conclusions of Law herein as required under Fed. R. Civ. Pro. 52(a), the Court concludes that Akeso has established by clear and convincing evidence that the parties had an implied-in-fact contract that included an agreement to transfer the MigreLief trademark to Akeso. Furthermore, the Court, invoking its equitable powers, concludes that the parties' intent is best accomplished by setting fair and reasonable monetary consideration for the transfer of the MigreLief trademark at $100,000. For these reasons, the Court finds in favor of Akeso on the issue of implied contract-specific performance (Counterclaim 9) and dismisses Akeso's promissory estoppel claim (Counterclaim 5) as moot.

FINDINGS OF FACT, OPINION AND ORDER -- 23

## II. Trademark Infringement, Unfair Competition and Unfair and Deceptive Trade Practices Claims

Under the facts of this case, which are different from any reported case I have been able to find, I conclude that both parties were entitled to use the disputed trademark pending resolution of this litigation. Prior to the termination of their business relationship, the parties conducted business for more than 12 years. Written contracts were in effect only a small fraction of that time. Curt Hendrix likely had a good opportunity to immediately secure the trademark for Akeso by following through and signing a final agreement as contemplated by the Memo Agreement of September 27, 2005. However, the parties' negotiations bogged down over relatively minor details. In the span of the next ten years, despite engaging in further negotiations that involved a variety of terms related to the transfer of the trademark and distribution rights, and despite the continuing business relationship while Akeso worked to build the MigreLief trademark, a final agreement was never signed that provided for Akeso's receipt of the trademark.

The parties' relationship ended in large part because of Quantum's out-of-channel sales. It was apparent at trial that David Shaw had no acceptable explanation for Quantum's breach of the sales agreement and, more importantly, Mr. Shaw's failure to correct a significant breach when it came to his attention. The breaches by Quantum not only affected the parties' relationship but also prolonged this litigation. The sales issues necessitated substantial discovery, expensive expert reports, and the calling of a jury to resolve the amount of damages.

Until this Court rendered this Opinion and Order, each party had a good faith belief that it was entitled to use the MigreLief trademark. Quantum had ownership of the trademark and Akeso had a legitimate basis to believe that it was entitled to obtain the trademark when the parties' business relationship concluded. Because I conclude that both parties had a right to use the

FINDINGS OF FACT, OPINION AND ORDER -- 24

trademark until the conclusion of this litigation, I dismiss with prejudice the parties' remaining MigreLief trademark claims in their entirety. (Quantum Claim 2; Akeso Counterclaims 7, 8, 11, 12, 13, 14). I also conclude, based on the evidence submitted at summary judgment and, in light of the circumstances of this case as a whole, that any infringement of the PURACOL trademark as alleged in Akeso's Counterclaims 15 through18 was unintentional, promptly rectified and sufficiently de minimis that no award of damages is warranted. I, therefore, also dismiss those counterclaims.

## III. Attorneys' Fees

The Court will not entertain claims for attorneys' fees by either party. No final agreement was ever reached as to attorney fees, each party prevailed on some of its claims, and the actions or failures to act by both parties led to this litigation.


DATED this 2nd day of August, 2017.



_____
John Jelderks
U.S. Magistrate Judge